

FILED

02/27/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 15, 2016 Session

**STATE OF TENNESSEE v. FRED BIRCHFIELD**

**Appeal from the Criminal Court for Morgan County**
**No. 2010-CR-80    E. Eugene Eblen, Judge**

_____

**No.  E2016-00493-CCA-R3-CD**
_____

The Defendant, Fred Birchfield, was found guilty by a Morgan County Criminal Court jury of second degree murder, a Class A felony, and reckless homicide, a Class D felony.  *See* T.C.A. §§ 39-13-210 (2014) (second degree murder), 39-13-215 (2014) (reckless homicide).  The trial court sentenced the Defendant to consecutive terms of eighteen years for second degree murder and three years for reckless homicide, for an effective twenty-one-year sentence.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his second degree murder conviction and (2) the trial court erred by failing to grant his motion for a change of venue.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Andrew Pate (on appeal and at motion for new trial), Knoxville, Tennessee, and Michael Hatmaker (at trial) and Brent Gray (at trial), Jacksboro, Tennessee, for the appellant, Fred Birchfield.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Russell Johnson, District Attorney General; and Frank Harvey and Tiffany Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an incident during which the Defendant fatally shot John C. Robbins and Melissa Norris.  At the trial, the recording of a 9-1-1 call was played for the jury.  In the recording, the Defendant told the dispatcher that two people were dead on the road in front of his home.  The Defendant stated that "they" pulled their vehicle over, that "they" pulled out a .44-caliber firearm, and that the Defendant shot "them."  The Defendant

identified Mr. Robbins and referred to Ms. Norris as Blondie. The dispatcher asked the Defendant to calm down.

The Defendant told the 9-1-1 dispatcher that Mr. Robbins displayed a .44-caliber pistol, that the Defendant "jumped out" of his vehicle, that the Defendant had a .22-caliber pistol, that Mr. Robbins said he would "blow off" the Defendant's head, and that the Defendant told Mr. Robbins that Mr. Robbins "did not have to do that." The Defendant said that before the shooting, he pulled his vehicle beside the victims' truck because "they came down here starting some stuff." The Defendant said that his hand was bleeding because Mr. Robbins shot Mr. Robbins's gun at the Defendant and that the Defendant "jerked" Mr. Robbins's gun out of Mr. Robbins's hand. The Defendant said that after he got out of his vehicle, he told Mr. Robbins to shoot him because he would rather be shot by a friend than by someone who "snuck around [his] back." The Defendant said he "just shot" the guns and did not know where the victims had been injured. The Defendant stated that he fired his gun until it was empty, that he fired Mr. Robbins's .44-caliber gun until it was empty, and that afterward, he threw Mr. Robbins's gun at Mr. Robbins, who was still inside the truck.

Former Morgan County Sheriff's Deputy Rick Hamby testified that on May 29, 2010, he responded to the scene and that the Defendant waved for the deputy to stop. Deputy Hamby said that the Defendant showed him Mr. Robbins's truck and that the Defendant reported a "gunfight" with Mr. Robbins, who was deceased inside the truck. Deputy Hamby knew Mr. Robbins and said a woman, whom the Defendant referred to as Blondie, was also deceased inside the truck.

Deputy Hamby testified that although he did not question the Defendant about the shooting, the Defendant stated that the victims had driven by the Defendant's home several times, that the victims were cursing and yelling at the Defendant, and that Blondie called the Defendant a "suck a--." Deputy Hamby said the Defendant reported that he saw the victims turn on the road across from the Defendant's home and that a "short time" later the Defendant heard three or four gunshots, which the Defendant thought sounded like a .22-caliber or a .22-caliber magnum firearm. Deputy Hamby said the Defendant stated that he drove to Lawrence Ellis's home just down the road and that when the Defendant was driving home, the victims pulled their truck beside the Defendant's truck. The Defendant said that Mr. Robbins told the Defendant that the Defendant owed Ms. Norris an apology and that the Defendant refused and said "f--- that b----." Deputy Hamby said the Defendant explained that the Defendant and Mr. Robbins each admitted they were carrying guns, that the Defendant got out of his truck and suggested the men be friends, that the Defendant walked to Mr. Robbins's truck window, that the Defendant "reached for [Mr. Robbins's] gun . . . and that it went off." Deputy Hamby said the Defendant also explained that the Defendant fired his gun until "it went empty" and that the Defendant took Mr. Robbins's gun and fired it

until it was also empty. Deputy Hamby said that the Defendant stated, "I didn't mean to kill that girl, but I'm glad they're dead. I don't have to look behind me anymore."

On cross-examination, Deputy Hamby testified that he arrived at the scene around 1:00 a.m., that the Defendant was cooperative, and that the Defendant's left hand was hurting, although the deputy did not examine the hand. Deputy Hamby said that the Defendant did not appear to have cleaned himself.

Morgan County Sheriff's Deputy Caleb Pemberton testified that he drove the Defendant to the hospital to determine his blood alcohol concentration and that during the drive, the Defendant said he was "afraid of Morgan County" and feared for his life. Deputy Pemberton said the Defendant explained that Mr. Robbins pulled out a gun, that the Defendant shot Mr. Robbins and took Mr. Robbins's gun, and that the Defendant shot Mr. Robbins again. Deputy Pemberton said that the Defendant stated that before the shooting, the victims turned onto the road across from the Defendant's home, that the Defendant later heard four or five gunshots that he thought came from a .22-caliber or .22-caliber magnum firearm, that the Defendant had been at a friend's home when he heard the gunshots, and that the Defendant decided to go home after hearing the gunshots. Deputy Pemberton said that the Defendant explained that during the drive home, he pulled his vehicle beside the victims' truck on the road, that Mr. Robbins pulled out a gun, that the Defendant pulled out his gun and shot at Mr. Robbins, that the Defendant took Mr. Robbins's gun from Mr. Robbins, and that the Defendant shot Mr. Robbins with Mr. Robbins's gun. Deputy Pemberton recalled the Defendant's saying, "I won't be railroaded by [Mr. Robbins] no more. [Mr. Robbins] ran over me before[,] and I'm not going to go through that again."

On cross-examination, Deputy Pemberton testified that he did not examine the victims' truck but that he saw a gun lying inside the truck. He did not notice any cartridge casings inside the truck. He agreed the Defendant was cooperative.

Morgan County Sheriff's Deputy Mike Wren testified that when he arrived at the scene, he saw a black truck parked in the middle of the road. He said the truck's lights were on, the engine was running, and the truck was in second gear but not moving. A photograph showed the front bench seat inside the truck. The photograph showed Ms. Norris on the right end of the seat, slumped toward the passenger door, and it showed Mr. Robbins in the middle of the seat slumped toward Ms. Norris. Deputy Wren said that the driver's door was not open when he arrived and that the passenger-door window was shattered. Deputy Wren knew Mr. Robbins.

Deputy Wren testified that the distance between the ground and the bottom of the driver's side window was four feet, two and one-half inches. He said that a .44-caliber magnum revolver, which was pointed toward Ms. Norris, was found on Mr. Robbins's lap

and that the revolver contained cartridge casings. He said that a .22-caliber semi-automatic Ruger, which contained eleven unfired bullets, was also found inside the truck and that the firearm was found between Mr. Robbins and the center console. He noted the Ruger was not visible from the driver's door.

Deputy Wren testified that a nine-shot revolver, containing eight cartridge casings and one unfired bullet, was found inside the Defendant's truck. Deputy Wren said that forty-four .22-caliber unfired bullets were found inside the Defendant's pants pockets.

Deputy Wren testified that Mr. Robbins's truck was secured, towed, and searched. Deputy Wren said that inside the cab and the bed of the truck, he found a suitcase, a twelve-pack or eighteen-pack of beer, a bottle of wine, and six to twelve marijuana plants. He said that Tennessee Bureau of Investigation (TBI) Agent Legg found a bullet lodged in the center console. Deputy Wren recalled that the medical examiner found a bottle of pills and a smoking pipe in Ms. Norris's clothes.

On cross-examination, Deputy Wren testified that the pipe found in Ms. Norris's clothes appeared to be used to smoke amphetamines and cocaine, but not necessarily marijuana. Deputy Wren agreed that he found open beer cans and a butane lighter inside the truck and that attached to a seat belt, he found a set of leg irons, which he assumed was decorative. He agreed he found boxes of bullets for the .44-caliber and .22-caliber firearms inside Mr. Robbins's truck and said the boxes were "right in front of" Mr. Robbins.

Deputy Wren testified that the Defendant's firearm was a type of gun many "older people [had] for self[-]defense." Deputy Wren said that the barrel of the firearm found between Mr. Robbins and the console was pointed toward the seat. Deputy Wren did not know if the Defendant had a bloody hand at the scene. Deputy Wren agreed that Mr. Robbins was about six feet tall and weighed 175 to 180 pounds. Deputy Wren said that he found one beer can inside the Defendant's truck but that he could not determine at the scene whether the Defendant was under the influence of alcohol.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she performed the victims' autopsies. Dr. Mileusnic-Polchan stated that Ms. Norris sustained a gunshot wound to the left eye, that the small-caliber bullet entered the brain, and that the brain was severely damaged. Dr. Mileusnic-Polchan concluded that this gunshot wound was the cause of death. She did not find any gunshot powder or soot on Ms. Norris or her clothes, leading Dr. Mileusnic-Polchan to conclude that the gun was fired more than two or three feet from Ms. Norris. Dr. Mileusnic-Polchan stated that the toxicology analysis showed the presence of methamphetamine, amphetamine, oxycodone, and Xanax.

Dr. Mileusnic-Polchan testified that Mr. Robbins suffered multiple gunshot wounds from two firearms. She stated that Mr. Robbins had five wounds from a small-caliber firearm, that one wound was inflicted at close range to the left side of the face, which fractured the left mandible, and that the bullet was recovered from the tongue. She stated that another bullet struck the left shoulder and was fired from close range based upon the amount of gun powder found on Mr. Robbins's clothes. Dr. Mileusnic-Polchan said that other bullets struck the left shoulder and exited the chest, struck and exited the left arm, and struck the right hand and wrist. Dr. Mileusnic-Polchan stated that nine large-caliber bullets struck the left shoulder, left and right arm, left face, left and right chest, and abdomen. She stated that two bullets struck the abdomen and that these wounds were fatal because of damage caused to the aorta, renal artery, lumbar vertebrae, and colon. She stated that the toxicology analysis showed a blood alcohol concentration of .06% and the presence of methamphetamine, amphetamine, and oxycodone.

On cross-examination, Dr. Mileusnic-Polchan testified that Ms. Norris had healing bruises on her extremities, which were unrelated to the gunshot wounds. She agreed that the left arm showed a single bruise associated with a needle puncture and that the amount of methamphetamine in Ms. Norris's blood was high. Dr. Mileusnic-Polchan said that two glass pipes were found in Ms. Norris's clothes and that the material inside the pipes could have been methamphetamine. Dr. Mileusnic-Polchan said that she found loose oxycodone and Xanax tablets and a "pill container" with "pistol cartridges" in Ms. Norris's clothes. Dr. Mileusnic-Polchan agreed that Mr. Robbins had been drinking alcohol and had consumed methamphetamines and oxycodone near the time of his death.

Gloria Sweeten testified that Mr. Robbins was her youngest brother and that Ms. Norris, to whom she referred as Blondie, lived with Mr. Robbins. Ms. Sweeten and her husband lived on a large parcel of land, which contained a chicken house. Ms. Sweeten said that Mr. Robbins used the chicken house to work on farm equipment and vehicles, that Mr. Robbins brought his friends to the chicken house, and that she met the Defendant at the chicken house. She said that she saw the Defendant and Mr. Robbins together about one month before the shooting and that the men were not arguing. She said Mr. Robbins was left handed.

TBI Agent Steven Scott, an expert in forensic firearm identification, testified that he analyzed three firearms and various bullets, bullet fragments, and cartridge casings. Relative to the Ruger .22-caliber semi-automatic pistol found inside Mr. Robbins's truck, Agent Scott determined that none of the evidence matched the gun. Relative to the .22-caliber revolver found inside the Defendant's truck, Agent Scott stated that the .22-caliber cartridge casings recovered from the gun's cylinder matched the cartridge casings that were removed from the gun and submitted for analysis. Because of the damage sustained to the bullets submitted for

analysis, he was unable to determine conclusively whether the bullets and bullet fragments recovered from the scene and the victims were fired from the .22-caliber revolver.

Agent Scott testified that the six .44-caliber magnum cartridge casings he analyzed were fired from the .44-caliber magnum revolver found inside Mr. Robbins's truck. Relative to a bullet recovered from inside Mr. Robbins's truck, Agent Scott determined that it was fired from the .44-caliber magnum revolver. Agent Scott conclusively determined that five bullet fragments removed during Mr. Robbins's autopsy were fired from the .44-caliber magnum revolver.

On cross-examination, Agent Scott testified that he did not analyze the firearms for accuracy or range but that generally, a bullet from a .22-caliber firearm could travel up to one and one-half miles. He said, though, he did not think a person who was "lying and waiting" to kill another person would have great success from 100 yards.

TBI Agent Jason Legg testified that he assisted in the investigation after the truck had been towed to the secured impound lot. Agent Legg said that although the driver's side door did not have any bullet holes, the center console had one. Agent Legg said that Mr. Robbins was deceased at the scene and that none of Mr. Robbins's body was outside the truck. Agent Legg noted that Mr. Robbins's feet were "planted in the floor of the truck" and that the truck's location in the roadway indicated it had been traveling away from the Defendant's home.

Paramedic Patrick Sexton testified for the defense that he responded to the scene. Mr. Sexton stated that the Defendant had blood on the left hand and fingers but that the blood was not from an injury. Mr. Sexton said that he saw a tear on the top of the Defendant's left hand, powder burns between the left index finger and thumb, and dark discoloration in the same area without any blood.

Upon this evidence, the Defendant was convicted of second degree murder relative to Mr. Robbins and of reckless homicide relative to Ms. Norris. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his second degree murder conviction for the death of Mr. Robbins. He does not challenge his reckless homicide conviction for the death of Ms. Norris. He argues that he acted in self-defense, or alternatively, that he acted during a state of passion produced by adequate provocation or during mutual combat. The State responds that the evidence is sufficient and that the jury rejected the Defendant's claims that he acted in self-defense, during a state of passion produced by adequate provocation, or during mutual combat.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (Supp. 2009) (amended 2011, 2014). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In the light most favorable to the State, the record reflects that on the night of the shooting, the Defendant was driving home when he encountered Mr. Robbins's truck on the road. The proof showed that Mr. Robbins's truck was traveling away from the Defendant's home. The Defendant and Mr. Robbins both possessed firearms. The men exchanged words, and the Defendant left his truck and approached Mr. Robbins's truck. At some point during the incident, the Defendant fired his revolver into Mr. Robbins's truck, obtained control over Mr. Robbins's firearm, and fired Mr. Robbins's firearm into Mr. Robbins's truck.

The Defendant's .22-caliber revolver and Mr. Robbins's .44-caliber revolver were the only weapons used during the shooting. No evidence showed that the Defendant knew about the third firearm found inside Mr. Robbins's truck or that this gun was displayed during the incident. The firearm analysis report showed that the Defendant's firearm had been fired

eight times and contained one unfired the bullet, that Mr. Robbins's .44-caliber revolver had been fired six times, and that the bullet recovered from inside Mr. Robbins's truck had been fired from Mr. Robbins's firearm. Likewise, the five bullet fragments removed during Mr. Robbins's autopsy were fired from Mr. Robbins's gun. The autopsy showed that Mr. Robbins was shot five times with the small-caliber firearm and that two of those wounds were inflicted at close range. Mr. Robbins was also shot nine times with the large-caliber firearm, and two of these wounds were fatal.

Although the Defendant asserted that his conduct was in self-defense or alternatively, that he acted pursuant to adequate provocation or in mutual combat, the evidence reflects that any reasonable belief of imminent danger of death or serious bodily injury, mutual combat, or adequate provocation had ended after the Defendant obtained control of Mr. Robbins's .44-caliber revolver. Once the Defendant obtained control of the .44-caliber revolver, any threat to the Defendant had ended. However, the Defendant fired two firearms into Mr. Robbins's truck, inflicting fourteen wounds, two of which were fatal. We note that Mr. Robbins never left his truck. Furthermore, although the Defendant claimed Mr. Robbins fired his gun at him, no physical evidence showed that either gun was fired at the Defendant. The paramedic who treated the Defendant testified that the blood on the Defendant's left hand and fingers was not the result of an injury, although the Defendant had a tear and gunpowder burns on his left hand. Based upon the amount of gunpowder residue on Mr. Robbins's clothes, the evidence shows that two of Mr. Robbins's wounds were inflicted at close range. A reasonable juror could have concluded beyond a reasonable doubt that the Defendant's shooting two firearms fourteen times into Mr. Robbins's truck was reasonably certain to cause Mr. Robbins's death. The evidence is sufficient to support his second degree murder conviction. The Defendant is not entitled to relief on this basis.

Although the Defendant does not challenge his reckless homicide conviction for the death of Ms. Norris, we conclude that the evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

## II. Motion for a Change of Venue

The Defendant contends that the trial court erred by failing to grant his motion for a change of venue. The Defendant argues that the court erred by concluding at the pretrial motion hearing that the court would only rely upon prospective juror statements during jury selection to determine whether a change of venue was warranted, that the court did not instruct him to renew his motion at the trial, and that the court erred by concluding at the motion for a new trial hearing that the issue was waived for failure to renew the motion at the trial. The State responds that the Defendant has waived consideration of this issue because the motion was not supported with affidavits as required by the Rules of Criminal Procedure and because he did not renew the motion during jury selection. Alternatively, the State

argues that the Defendant failed to present evidence that any juror was biased or prejudiced against him.

Tennessee Rule of Criminal Procedure 21(a) states that a trial court may change venue upon a defendant's motion "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." A motion for a change of venue "shall be accompanied by affidavit(s) averring facts constituting the alleged undue excitement or other cause on which the motion is based" and "shall be made at the earliest date after which the cause for the change of venue is alleged to have arisen." Tenn. R. Crim. P. 21(b), (c).

The decision to grant or to deny a motion for a change of venue based upon pretrial publicity lies within the discretion of the trial court, and this court will only reverse upon an abuse of discretion. *State v. Crenshaw*, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001); *see State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). A defendant is required to "show that the jurors were biased or prejudiced against him before his conviction will be overturned on appeal." *Crenshaw*, 64 S.W.3d at 386; *see State v. Melson*, 638 S.W.2d 342, 360-61 (Tenn. 1982). A juror's exposure to pretrial publicity does not automatically result in the juror's bias or prejudice against a defendant. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991). The burden is on a defendant to establish "the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989).

The record reflects that on July 19, 2011, the defense filed a motion for a change of venue on the grounds that Mr. Robbins had "extensive family and ties to public officials" in Morgan County and that the case had received excessive publicity in the community. An affidavit, stating the facts supporting a venue change, was not attached the motion. At the October 12, 2011 motion hearing, the trial court told defense counsel the following:

> Let me tell you how we operate. . . . When people move for a change of venue we wait and we see what the jurors say. . . . Now if it appears that it's necessary then we will grant it and that would put the trial off. . . . But so far, I've not found any that we couldn't get a jury on. . . . But we'll work that way with you.

The record reflects that when jury selection began, the panel of prospective jurors were asked if they were related to any of the parties. One juror was excused after stating she was related to Mr. Robbins, and another juror was placed on the panel. The prosecutor told the prospective jurors the charges against the Defendant and the names of the victims and asked whether any of the jurors knew the Defendant or the victims. A juror was a former coworker of Mr. Robbins. When asked if knowing Mr. Robbins would impact his ability to

be fair and impartial, the juror stated, "Well, it's hard to say." Another juror was Deputy Caleb Pemberton's aunt but said she could judge the deputy's credibility "the same as anyone else[.]" Another juror knew Mr. Robbins's name but was not acquainted with him, and another juror said he knew Deputy Rick Hamby. No questions were asked of these jurors.

The prosecutor asked the prospective jurors if they recalled reading about this case in the newspaper, and no responses are reflected in the transcript. When the prosecutor asked the jurors again, one juror admitted he had read newspaper articles about the case but said he would separate what he had read in the newspaper from the evidence at the trial. The prosecutor told the jurors that they were required to decide this case without sympathy or prejudice for any person and that they had to decide the case based upon the facts and the evidence. The prosecutor asked the jurors if they could comply, but no responses are reflected in the transcript.

Defense counsel asked the prospective juror who stated he had read newspaper articles about the case where the juror resided. The juror who had previously worked with Mr. Robbins stated the men were coworkers in the 1980s. The juror considered Mr. Robbins a friend, and counsel discussed the State's burden of proof. Counsel asked the juror if he would find the Defendant not guilty if the State failed to "prove something," but no response is reflected in the transcript. Counsel questioned the juror who was Deputy Pemberton's aunt, and she said that she thought she and Mr. Robbins attended the same high school. Counsel asked her if she would pay close attention to Deputy Pemberton's testimony, but no response is reflected in the transcript.

The transcript reflects that preemptory challenges were submitted to the trial court, and six prospective jurors were excused. The excused jurors included the juror who was Mr. Robbins's former coworker, Deputy Pemberton's aunt, the juror who was familiar with Mr. Robbins's name but not acquainted with Mr. Robbins, and the juror who recalled reading newspaper articles about this case. The fifth and sixth jurors' responses were not related to whether they had been exposed to pretrial publicity or knew any of the parties.

Six additional prospective jurors were placed on the panel, and none of the jurors expressed any familial relationship with the parties. The trial court asked whether the jurors had knowledge of the facts of this case, and one juror stated that she had read newspaper articles about the case. The court asked if she had any opinions about the guilt or innocence of the Defendant, and the transcript does not reflect a response. The juror later said, "I think I can," when the court asked if she could listen to the proof and render a verdict based upon the evidence. The juror was related to another juror on the panel, and the jurors admitted someone close to both of them had been murdered. Both jurors were excused after preemptory challenges were submitted to the court.

Two additional prospective jurors were placed on the panel and neither was related to the parties. Both of the jurors reported reading newspaper articles about this case. One of the jurors had worked with the Defendant's wife three years previously but stated the professional relationship would not impact her ability to render a fair and impartial verdict. The other juror admitted she attended church with Mr. Robbins's sister and that they had discussed "the situation" multiple times. When asked whether the juror could render an impartial verdict based upon the evidence, the juror stated that it was "a tough question" but that she "believe[d]" she could. Both potential jurors were excused after peremptory challenges were submitted.

Two additional prospective jurors were placed on the panel and neither was related to the parties. No responses are reflected in the transcript when the trial court asked the jurors if they had knowledge of the facts of this case. One of the jurors had religious objections to rendering a judgment against another person, and she was excused after preemptory challenges were submitted to the court.

One additional prospective juror was placed on the panel, and the juror stated that she was not related to the parties but that she had read newspapers articles about this case. The juror denied forming an opinion about the guilt or innocence of the Defendant based upon the newspaper articles. However, the juror was excused because she provided care to a disabled child.

One additional prospective juror was placed on the panel, and the juror was not related to the parties. The juror admitted reading newspaper articles about this case and denied forming an opinion about the Defendant's guilt or innocence based upon those articles. The juror was excused because he provided care to his ill wife.

One additional prospective juror was placed on the panel. No responses are reflected in the transcript to the trial court's inquiry if the juror was related to the parties, knew anything about the facts of the case, and had anything she needed to tell the court. The juror was excused as a result of childcare conflicts.

One additional prospective juror was placed on the panel, and the juror was not related to the parties. He admitted he knew about the case and said Ms. Norris's father-in-law was the juror's close friend. The juror said that he and Ms. Norris's father-in-law had discussed this case frequently and that he had a "very strong opinion." The juror was excused for cause by the trial court.

One additional prospective juror was placed on the panel, and no responses are reflected in the transcript when the trial court asked if the juror was related to the parties and if the juror had knowledge about the facts of the case.

No additional jurors were excused, and two alternates were placed on the panel. The record reflects no responses when the trial court asked whether the alternate jurors were related to the parties and whether the jurors had knowledge about the facts of the case.

As a preliminary matter, defense counsel's motion for a change of venue did not include an affidavit stating "facts constituting the alleged undue excitement or other cause on which the motion is based." *See* Tenn. R. Crim. P. 21(b). Although appellate counsel argues that the Rule does not require an affidavit to be attached to the motion at the time it is filed with the trial court, the Rule states the motion "*shall be accompanied* by affidavits." *Id.* (emphasis added). Appellate review of a trial court's decision to deny a motion for a change of venue has been previously waived because the defendant failed to comply with the portion of the Rule requiring affidavits be attached to the motion. *See State v. Robert Hockett*, No. 89-99-III, 1990 WL 198878, at *3 (Tenn. Crim. App. Dec. 12, 1990). In any event, we will consider whether the trial court erred relative to the motion for a change of venue in the interest of justice.

At oral argument, appellate counsel stated that the trial judge told defense counsel the court did not hold hearings for change of venue motions, that the trial judge stated the court only examined juror responses during jury selection to determine if jurors were biased, that the court's procedure violated *State v. Davidson*, 121 S.W.3d 600, 611 (Tenn. 2003), and *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979), and that the court stated it would not consider the factors delineated in *Davidson* and *Hoover*.

The record reflects that at the October 12, 2011 hearing, the trial judge told defense counsel that the court's practice was to determine during jury selection whether the prospective jurors had been exposed to pretrial publicity and had family ties to the parties. The court stated that if it appeared during jury selection that the Defendant would be unable to obtain a fair trial, the court would grant a motion for a change of venue. Although the court deferred hearing evidence from defense counsel at the time the motion was filed, preferring to wait until jury selection, we disagree that the court refused to consider the motion or to consider the appropriate factors in determining whether to grant or deny the motion. The court's statements were explanatory of the local practice and invited counsel to raise any objections during jury selection. The record does not reflect that the trial court denied the motion or prohibited counsel from presenting evidence supporting the motion during jury selection. Although a motion for a change of venue "shall be made at the earliest date after which the cause for the change of venue is alleged to have arisen," nothing in the

Rules of Criminal Procedure requires a trial court to hold an evidentiary hearing before jury selection begins.

Furthermore, defense counsel did not renew the motion for a change of venue during jury selection. *See State v. Rick Hanebutt*, No. W2005-01301-CCA-R3-CD, 2006 WL 2818240, at *10 (Tenn. Crim. App. Oct. 2, 2006) (concluding that the defendant waived appellate review of the trial court's denial of his motion for a change of venue because the defendant failed to renew his motion during jury selection as instructed by the court's pretrial order initially denying a venue change). In any event, the record reflects that although multiple prospective jurors admitted reading newspaper articles about this case, all of the jurors who had been exposed to pretrial publicity were excused by the use of preemptory challenges. We note that the excused jurors included those who believed they could render an impartial verdict based upon the law and the evidence presented at the trial, despite the exposure to pretrial publicity. The record reflects that none of the jurors who were empaneled had been exposed to pretrial publicity.

Relative to Mr. Robbins's familial ties in the community, none of the empaneled jurors were related to or acquainted with the parties or the victims' families. The prospective jurors who were related or acquainted with the parties or the victims' families were excused by the use of preemptory challenges or for cause by the trial court.

Regardless of the prospective jurors' responses during jury selection, defense counsel could have renewed his request for a change of venue during jury selection and presented any evidence he possessed supporting the motion. Nothing in the record suggests the trial court would have denied counsel the opportunity to present any relevant evidence at this time. The trial court would have been obligated to rule on the motion before beginning the trial. Although we acknowledge counsel did not present to the court evidence he possessed supporting his motion for a change of venue, the record reflects that the prospective jurors who were empaneled were not exposed to pretrial publicity, did not have opinions about the Defendant's guilt or innocence, and were not acquainted with the parties or the victims' families. Therefore, the evidence shows that the final empaneled jury was not biased or prejudiced against the Defendant and that the Defendant is unable to establish he was entitled to a change of venue.

The Defendant also argues that the subsequent trial judge who presided over the motion for a new trial hearing erroneously denied him a new trial based upon the motion for a change of venue. However, as we have concluded above, the judge who presided over the trial never ruled on the motion. We note that the defense made no attempts to present evidence at the motion for a new trial hearing relative to the merits of the claim. The judge at the motion for a new trial hearing asked the parties if the motion was renewed during jury selection. The parties could not provide the court with an answer because a transcript had

not been created. In any event, the court determined that the trial judge told defense counsel that the motion for a change of venue was premature and instructed counsel to raise the issue at the trial. The court noted that the record before the court did not show the motion was renewed at the trial and denied relief.

Appellate counsel requested permission and time to prepare a transcript of the jury selection to determine whether defense counsel renewed the motion for a change of venue. The prosecutor objected. The court stated that the trial judge wanted to address the motion at the trial and that the record did not reflect the motion was renewed. The court determined that the issue was waived for failing to renew the motion at the trial. However, the trial court filed a written order one month later stating that it had reviewed the trial transcript. The court determined that the trial judge adequately addressed the motion during the pretrial hearing, in which he advised defense counsel that the motion was premature and that it should be addressed at the trial. The court found that defense counsel did not renew the motion at the trial and determined that the issue had been waived.

We disagree with appellate counsel's characterization that the trial court told defense counsel that the court would not analyze the *Davidson* and *Hoover* factors in determining whether to grant or deny a motion for a change of venue. Likewise, the record neither reflects that the court determined evidence related to these factors was irrelevant nor that the court prohibited counsel from renewing the motion at the trial. The record reflects, though, that the motion was not discussed during jury selection and that the jurors empaneled on the jury had not been exposed to pretrial publicity and were not related to or acquainted with the parties or the victims' families. The trial court's waiver determination at the motion for a new trial hearing notwithstanding, the Defendant failed to establish the jurors were biased or prejudiced against him. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE